IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. |
| ) | 10-00320-14-CR-W-DGK |
| RAFAEL ZAMORA, ) | |
| ) | |
| Defendant. ) | |

## **REPORT AND RECOMMENDATION TO DENY**
## **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence seized during his arrest on November 19, 2010, and statements made by defendant during his arrest and subsequently after having been advised of his Miranda rights on the grounds that (1) police unlawfully entered defendant's home after he was taken into custody, (2) he was interrogated without having been advised of his Miranda rights, (3) his statement was involuntary, (4) the consent to search his home was involuntary, and (5) the statement he gave after he was advised of his Miranda rights was the fruit of earlier constitutional violations. I find that defendant's Constitutional rights were not violated and therefore, his motion to suppress should be denied.

## *I.  BACKGROUND*

On November 18, 2010, an indictment was returned charging defendant with one count of conspiracy to distribute cocaine, crack cocaine, and marijuana, in violation of 21 U.S.C. § 846,

and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(1). The indictment also includes a criminal forfeiture count listing a silver/grey 2005 Chevrolet Avalanche bearing Missouri license 5SN463 registered to defendant Zamora.

On November 19, 2010 -- the day after the indictment was returned and an arrest warrant was issued -- police went to defendant's residence to execute the arrest warrant. Defendant answered the door in a T-shirt, came out onto the porch, and was handcuffed. As he and his arresting officer were walking back into the residence due to the cold weather, defendant was advised that he was being arrested on a charge of conspiracy to distribute marijuana. He voluntarily stated, as he and the agent were walking into the house, that he had some stuff under the basement steps that the officers could retrieve. Agents found marijuana under defendant's basement steps. Defendant was transported to police headquarters, advised of his <u>Miranda</u> rights, and made an incriminating statement.

On June 14, 2011, defendant filed the instant motion to suppress (document number 251). On June 22, 2011, the government filed a response (document number 263) arguing that defendant volunteered that he had "stuff" in his house and that the officers could go in and get it, there is no evidence that defendant's statement was involuntary, there is no evidence that

his consent were involuntary, and defendant's subsequent statement at the police department was made after he voluntarily waived his Miranda rights.

On July 27, 2011, I held a hearing on defendant's motion. The government appeared by Assistant United States Attorney Bruce Rhoades. The defendant was present, represented by Eugene Harrison. The following witnesses testified:

1. Special Agent Christopher Kline, Drug Enforcement Administration

2. Dennis Conway, Private Investigator[1]

In addition, the following exhibits were admitted:

P. Ex. 1         Miranda waiver form

P. Ex. 2         Report describing defendant's statement

D. Ex. Z-19 PIC   Photograph of bag of marijuana seized from defendant's residence

D. Ex. Z-LAB     Lab report

On July 28, 2011, the government provided additional legal authority to supplement its response: United States v. Paul Riesselman, 646 F.3d 1072 (8th Cir. 2011).

## *II. EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

---

[1] Defendant offered the expert testimony of Dennis Conway regarding the marijuana, i.e., whether, once the stems and seeds were removed, it would actually be a user quantity rather than a distribution quantity. The government's objection to the testimony as irrelevant was sustained.

1.  On November 19, 2010, seven law enforcement officers from the Drug Enforcement Administration ("DEA"); Kansas City, Missouri, Police Department; and United States Marshal's Office gathered to execute an arrest warrant for defendant Rafael Zamora at 2908 Holly in Kansas City, Missouri (Tr. at 5, 22, 24). The arrest warrant included defendant's identifying information, and the officers had a picture of him as well (Tr. at 6).

2.  The officers arrived at 2908 Holly at 6:00 a.m., and two of them went to the sides or back of the house while DEA Special Agents Tim McCue and Christopher Kline, Deputy Marshal Bryan Cutler, and Detectives Vern Huth and Jim Svoboda went to the front door (Tr. at 5-6, 22-23). It was still dark outside (Tr. at 6-7, 24). The officers at the front door were wearing jeans, sweatshirts, and bulletproof vests with police indicia (Tr. at 7). They did not have their guns drawn (Tr. at 7, 23). One of the officers knocked on the door (Tr. at 7, 24). Defendant Rafael Zamora answered the door (Tr. at 7-8, 24). Due to his clothing (a T-shirt and boxer shorts), defendant appeared to the officers to have just gotten out of bed (Tr. at 8).

3.  The officers asked defendant to step outside, which he did (Tr. at 8). They placed him in handcuffs, but then walked back inside the house because it was cold outside and defendant was not wearing much clothing (Tr. at 8, 24). Defendant did not

appear to be armed; he was not confrontational or uncooperative (Tr. at 8).

4. As they were stepping back into the house, Special Agent Kline told defendant he was being arrested on a warrant for distribution of marijuana (Tr. at 9, 28). Special Agent Kline did not ask defendant any questions (Tr. at 9). Defendant said he had some "stuff" under the basement steps and that the officers could go get it (Tr. at 9, 29, 61). The statement was unsolicited (Tr. at 9, 29). Defendant said the stuff would be in a white plastic grocery bag (Tr. at 10, 29). Special Agent Kline assumed defendant meant drugs when he referred to "stuff" (Tr. at 62).

5. Someone conducted a security sweep[2] of the residence, finding only defendant's wife and children (Tr. at 42, 62). Special Agents McCue and Kline walked through the living room and kitchen, turned the basement light on, and then went down the steps to retrieve the grocery bag (Tr. at 11). From under the basement steps, they recovered a white plastic grocery bag containing a green leafy substance that appeared to be marijuana (Tr. at 11). The two agents then came back up the stairs and put the bag on the kitchen table (Tr. at 11-12).

---

[2]Special Agent Kline testified that he does not recall anyone performing a protective sweep but that it would be standard procedure for one to have been done (Tr. at 64),

5

6. Because defendant's vehicle was being seized pursuant to the criminal forfeiture count in the indictment, it needed to be cleaned out (Tr. at 12). Two officers were cleaning out the vehicle while others were trying to get clothes for defendant to wear (Tr. at 12). Other officers were trying to fill out the background information on a DEA form while they were sitting in the kitchen (Tr. at 12). Special Agent Kline, Detective Svoboda and Detective Huth were the only ones who had come into the house (Tr. at 37).

7. Defendant was then transported to Kansas City Police Department Headquarters by Detective Huth (Tr. at 13, 36-37). Special Agent Kline left the scene and went to execute another arrest warrant somewhere else (Tr. at 40). After that warrant had been executed, he went to the Kansas City Police Headquarters to interview defendant Zamora (Tr. at 40).

8. At 8:00 a.m. that same day, defendant was presented with a Miranda waiver form which was read to him (Tr. at 17). In addition, he read the following paragraph out loud:

> Before being asked any questions, I have been told of my right to remain silent, that anything I say can and will be used against me in court, that I have the right to talk with a lawyer and to have the lawyer with me during questioning. I have been told that if I cannot afford a lawyer that one will be appointed for me, at no cost to me, before I am questioned. I have also been told that I can stop talking at any time.
>
> **I understand all of these rights and I am willing to talk to you.**

(Tr. at 17, 20-21, 63; P. Ex. 1). Defendant appeared to understand the rights that were read to him (Tr. at 20). The waiver form was completed and signed by defendant before any questioning began (Tr. at 18).

9. While defendant was being interviewed, Special Agent Kline and Detective Svoboda took notes (Tr. at 19). Special Agent Kline's report was generated using those interview notes (Tr. at 19). Defendant said that he bought marijuana for $600 and resold it for $625 (Tr. at 52). When defendant was shown a picture of co-defendant Juan Marron and asked about him, defendant got angry and asked for an attorney (Tr. at 68). The interview, which had lasted approximately 30 to 40 minutes by then, stopped (Tr. at 64).

10. At no time did anyone do anything that was intimidating or coercive (Tr. at 20). Defendant appeared to Special Agent Kline to be voluntarily talking to him after having been advised of his rights (Tr. at 21). Special Agent Kline never heard anyone tell defendant he should think about his kids or that he could help himself if he cooperated (Tr. at 45). No search was done of the residence other than the security sweep and the retrieval of the plastic bag from under the basement steps at the direction of defendant (Tr. at 62).

7

### *III. ENTRY INTO DEFENDANT'S RESIDENCE AND FRUITS DOCTRINE*

Defendant argues that the entry into his residence was unlawful. Defendant offers no legal authority in support.

Even assuming the entry into defendant's residence was not legal, there is nothing to suppress as a result of it. Defendant claims that police illegally entered his house, interrogated him without advising him of his Miranda rights, and coerced him into granting permission to search his house. However, the evidence presented at the hearing is markedly different from this scenario. The uncontroverted evidence is that defendant came to do the door, he stepped outside, he was arrested pursuant to a warrant, and as he and Special Agent Kline were walking back into the house due to the cold (remembering that defendant was wearing a T-shirt and boxer shorts), Special Agent Kline informed defendant he was being arrested for selling marijuana and defendant volunteered that there was some under his basement stairs that the officers could go get.

"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained **by the Government's own wrong**

8

cannot be used by it in the way proposed." Silverthorne Lumber Company v. United States, 251 U.S. 385, 392 (1920) (emphasis added). "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either ***during or as a direct result of*** an unlawful invasion." Wong Sun v. United States, 371 U.S. 471, 485 (1963) (emphasis added).

Defendant's statement that he had marijuana under his basement steps was not obtained by police "during or as a direct result of" the entry into the house. The bag of marijuana itself was not obtained by police "during or as a direct result of" the entry into the house. The purpose of the exclusionary rule -- deterring police misconduct -- is not served when the police action "although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." United States v. Faulkner, 636 F.3d 1009, 1016 (8th Cir. 2011), quoting United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006). "We look at whether the impropriety of the misconduct was obvious or whether the official knew that his conduct was improper but engaged in it anyway and whether the misconduct was committed in the hopes that something might turn up." United States v. Faulkner, 636 F.3d at 1016.

Here the undisputed evidence is that Special Agent Kline took defendant back into the house after placing him under arrest because it was cold outside and defendant needed to get something

warmer to put on before being transported to police headquarters. Once defendant said there was "stuff" under the stairs and that the officers could go get it, the bag of marijuana was retrieved (while another officer looked for clothing for defendant to wear) but no further search was conducted of the house. Defendant was not questioned. There simply is no evidence that the agents entered defendant's residence in the hopes that "something might turn up." Additionally, there is no evidence that any statement or evidence was obtained as a direct result of an unlawful invasion. It was perfectly reasonable for Agent Kline to bring defendant inside his house to get some warm clothing to put on.

Blurting out a confession and the whereabouts of all illegal possessions does not result in suppression of everything under these circumstances despite no ill intent on the part of the police -- this would shield criminal behavior without promoting the purpose of the exclusionary rule. I have found no legal authority for using the exclusionary rule (or the fruits rule) in such a way, and I decline to do so today.

### *IV. SPONTANEOUS ADMISSION*

Defendant argues that his statement that he had "stuff" under the basement stairs was involuntary and a result of interrogation without having first been advised of his <u>Miranda</u> rights. Defendant's argument is without merit.

In <u>United States v. McGlothen</u>, 556 F.3d 698 (8th Cir.), <u>cert</u>. <u>denied</u>, 129 S. Ct. 2812 (2009), Kansas City, Missouri, police officers executed a search warrant on McGlothen's home after making two controlled drug buys. McGlothen was not there at the time, but drove past the house during the search. Officers then stopped McGlothen and brought him back to the residence. Sergeant Huth, the officer in charge of the search, explained to McGlothen why officers were there, told McGlothen he was under arrest, and began recording biographical information for booking. While obtaining the booking information, an officer approached Sergeant Huth with a gun found in the home during the search. Sergeant Huth then explained to McGlothen that he would also be charged with being a felon in possession of a firearm. McGlothen stated that the gun was his and he bought it for protection. McGlothen moved to suppress that statement, but the Eighth Circuit held that the officer's words indicating that McGlothen was to be charged with possession of a firearm were statements of fact, not the functional equivalent of an interrogation. Because McGlothen was not being interrogated, <u>Miranda</u> warnings were not required and the district court did not err in denying the motion to suppress. <u>United States v. McGlothen</u>, 556 F.3d at 702.

In <u>United States v. Barnes</u>, 195 F.3d 1027, 1029 (8th Cir. 1999), a defendant moved to suppress statements made after he

invoked his right to counsel after which officers told him he was going to be booked for possession of a firearm. The defendant responded by saying he "didn't think so," and officers asked what he meant. In response, the defendant made incriminating statements. The Eighth Circuit found the statements spontaneous, holding that "the officer's remark to [the defendant] that he was going to be charged with possession of a firearm was a statement of fact, not the functional equivalent of interrogation."

In this case, defendant's statement about having "stuff" under his basement steps was not the result of interrogation or its functional equivalent; therefore, <u>Miranda</u> warnings were not required. There is no evidence whatsoever that defendant's statement was involuntary. The scenario in defendant's motion to suppress is not supported by any evidence. Defendant had an opportunity at the suppression hearing to present evidence that the morning happened the way he described in his motion; defendant chose not to do so. As a result, there is neither fact nor law to support his claim that his statement was involuntary or the result of any form of interrogation. Instead, the only evidence before me was presented by the government and establishes that defendant's statement was voluntary.

## V. *STATEMENT MADE AT POLICE HEADQUARTERS*

As far as defendant's statement given at police head-quarters, he alleges as follows:

12

> [Defendant] was transported to the police station and at
> approximately 8 A.M. the same morning, [defendant] waived
> his Miranda rights and submitted to an unrecorded interview
> by SA Kline and Det. Swoboda [sic].  [Defendant's]
> recollection of the contents and substance of the interview
> are [sic] substantially different from that reported by SA
> Kline. . . .
>
> [T]he interrogation was coercive in and of itself and a
> continuation of the coercive treatment he experienced
> throughout, starting at 6 A.M. that morning.  In the
> totality of the circumstances, [defendant's] statements
> cannot be considered "voluntary," but instead statements
> made after his will had been overborne.

Once again, defendant made allegations in his motion but chose not to introduce any such evidence during the suppression hearing to contradict the evidence presented by the government. The undisputed evidence is that defendant was presented with a Miranda waiver form, it was read to him, he read it aloud, he signed the form, and then he gave a statement which was incriminating.

The government bears the burden of proving by a preponderance of the evidence that defendant made a knowing and voluntary waiver of his Miranda rights.  Colorado v. Connelly, 479 U.S. 157, 158 (1986); United States v. Dougherty, 810 F.2d 763, 772 (8th Cir. 1987).  There is no requirement that, to be voluntary, the waiver be the product of a free will.  Colorado v. Connelly, 479 U.S. at 170.  The sole concern of the Fifth Amendment, upon which Miranda was based, is governmental coercion.  Id.; United States v. Washington, 431 U.S. 181, 187 (1977).  The voluntariness of a waiver of this privilege depends on the

13

absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. <u>Colorado v. Connelly</u>, 479 U.S. at 170; <u>Moran v. Burbine</u>, 475 U.S. 412, 420 (1986); <u>Fare v. C.</u>, 442 U.S. 707, 726-27 (1979).

An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his <u>Miranda</u> rights. <u>North Carolina v. Butler</u>, 441 U.S. 369 (1979). An express written or oral statement of waiver of <u>Miranda</u> rights is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. <u>Id</u>. at 373.

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the <u>Miranda</u> case. As was unequivocally said in <u>Miranda</u>, mere silence is not enough. That doesn't mean that the defendant's silence, coupled with an understanding of his rights and course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

<u>Id</u>. at 373.

Whether a defendant waived his <u>Miranda</u> rights is a question of fact for the trial judge and must be determined on the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. <u>Id</u>. at 374; <u>United States v. Dougherty</u>, 810 F.2d 763, 772 (8th

Cir. 1987); Stumes v. Solem, 752 F.2d 317, 319 (8th Cir. 1985). The totality of the circumstances test applies. Dougherty, 810 F.2d at 773.

In this case, defendant was advised of his Miranda rights, he read the rights himself, and he signed the form waiving his rights. Special Agent Kline testified that defendant read his Miranda rights, signed the Miranda waiver form, appeared to understand his rights, and spoke to Special Agent Kline voluntarily. Once co-defendant Juan Marron was mentioned, defendant asked for an attorney and the interview stopped. There has been no credible evidence presented suggesting that defendant's statement was not voluntary.

## *VI. CONCLUSION*

Based on the above-stated findings of fact and the law as discussed in sections III through V, I conclude that defendant's constitutional rights were not violated during his contact with law enforcement on November 19, 2010. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence and his statements.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 19, 2011